# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of:<br>Information associated with accounts identified as<br>evaghermes@mac.com, evaghermes@me.com,<br>oghermes@mac.com, and oghermes@me.com<br>that is within the possession, custody, or control of<br>Apple, Inc. | Case No. **2:19-MJ-01902** |

## APPLICATION FOR WARRANT PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1590, 1351, 1546; 8 U.S.C. § 1324 | Labor trafficking, Fraud in Foreign Labor Contracting, Visa Fraud, Harboring of Alien, etc. |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*

Marcus Valle, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

City and State: _____

_____
*Judge's signature*

John McDermott, U.S. Magistrate Judge
*Printed name and title*

AUSA: Aron Ketchel (x1019)

## **ATTACHMENT A**

### **PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the Apple accounts identified as Apple IDs "evaghermes@mac.Com" ("SUBJECT ACCOUNT 1"), "evaghermes@me.com" ("SUBJECT ACCOUNT 2"), "oghermes@mac.com" ("SUBJECT ACCOUNT 3"), and "oghermes@me.com" ("SUBJECT ACCOUNT 4") (collectively, the "SUBJECT ACCOUNTS"), and specifically including associated iCloud and iTunes accounts associated with the SUBJECT ACCOUNTS, that is within the possession, custody, or control of Apple Inc., a company that accepts service of legal process at 1 Infinite Loop, M/S 36-SU, Cupertino, California, 95014, regardless of where such information is stored, held, or maintained.

## ATTACHMENT B

### ITEMS TO BE SEIZED

**I. SEARCH PROCEDURE**

1.     The warrant will be presented to personnel of Apple (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.     To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.     The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.     With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

5.    If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6.    The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.    Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.  __INFORMATION TO BE DISCLOSED BY THE PROVIDER__

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNTS, limited to that which occurred on or after October 5, 2007,[9] including:

i.   All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

ii.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

---

[9] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

iii. All data and information associated with the profile page of the SUBJECT ACCOUNT, including photographs, "bios," and profile backgrounds and themes;

iv. All communications or other messages sent or received by the SUBJECT ACCOUNT;

v. All user content created associated with the SUBJECT ACCOUNT;

vi. All location data associated with the SUBJECT ACCOUNT;

vii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

viii. All search history and web history, including web clicks or "History Events," by the user of the SUBJECT ACCOUNT;

ix. All web browsing activities that are identifiable with the SUBJECT ACCOUNT;

x. All stored files and other records stored on iCloud for each SUBJECT ACCOUNT, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWorks (including Pages, Numbers, and Keynote), iCloud Tabs, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

xi.  All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files);

b.  All other records and information, including:

i.  All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, e-mail addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

(I) the SUBJECT ACCOUNT.

(II)   any other account accessed by a device with an identifier responsive to the device identifiers called for in paragraph 10.b.iii below.

ii.  All activity, connection, and transactional logs for all activity relating to each SUBJECT ACCOUNT described above in Section II.10.a. (all log files, dates, times, durations, data transfer volumes, methods of connection, authentication logs, IP addresses, ports, routing information, dial-ups, and locations), including FaceTime call invitation logs, mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), messaging and query logs (including iMessage, SMS, and MMS messages), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find my iPhone logs, logs associated with iOS device activation and upgrades, and logs associated with web-based access of Apple services (including all associated identifiers);

iii. Any information identifying the device or devices used to access the SUBJECT ACCOUNT, including any Android ID, Advertising ID, unique application number, hardware model, operating system version, unique device identifier, Global Unique Identifier or "GUID," serial number, mobile network information, phone number, device serial number, MAC address, Electronic Serial Number ("ESN"), Mobile Electronic Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Number ("MIN"), Subscriber Identity Module ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identity ("IMEI"), or Apple advertiser ID or ID for advertisers ("IDFA"), and any

other information regarding the types of devices used to access
the SUBJECT ACCOUNT or other device-specific information;

       iv.   Any information showing the location of the
user of the SUBJECT ACCOUNT, including while sending or
receiving a message using the SUBJECT ACCOUNT or accessing or
logged into the SUBJECT ACCOUNT.

       v.    All stored files and other records stored
on iCloud for each SUBJECT ACCOUNT, including all iOS device
backups, all Apple and third-party app data, all files and other
records related to iCloud Mail, iCloud Photo Sharing, My Photo
Stream, iCloud Photo Library, iCloud Drive, iWorks (including
Pages, Numbers, and Keynote), iCloud Tabs, and iCloud Keychain,
and all address books, contact and buddy lists, notes,
reminders, calendar entries, images, videos, voicemails, device
settings, and bookmarks;

       vi.   All files, keys, or other information
necessary to decrypt any data produced in an encrypted form,
when available to Apple (including, but not limited to, the
keybag.txt and fileinfolist.txt files);

       vii.   All activity, connection, and
transactional logs for all activity relating to each SUBJECT
ACCOUNT described above in Section II.10.a. (all log files,
dates, times, durations, data transfer volumes, methods of
connection, authentication logs, IP addresses, ports, routing
information, dial-ups, and locations), including FaceTime call
invitation logs, mail logs, iCloud logs, iTunes Store and App
Store logs (including purchases, downloads, and updates of Apple

and third-party apps), messaging and query logs (including
iMessage, SMS, and MMS messages), My Apple ID and iForgot logs,
sign-on logs for all Apple services, Game Center logs, Find my
iPhone logs, logs associated with iOS device activation and
upgrades, and logs associated with web-based access of Apple
services (including all associated identifiers);

III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.  For each SUBJECT ACCOUNT listed in Attachment A, the
search team may seize:

a.  All information described above in Section
II.10.a. that constitutes evidence, contraband, fruits, or
instrumentalities of violations of Title 18, United States Code,
§ 1590 (Labor Trafficking);; Title 18, United Stated Code, §
1351 (Fraud in Foreign Labor Contracting); Title 18,  United
States Code, § 1546 (Fraud and Misuse of Visas, Permits, and
Other Documents); Title 8, United States Code, § 1324(a)
(Unlawful Employment of Aliens); Title 8, United States Code,
§ 1324(a)(1)(a)(iv) (Bringing in and Harboring Certain Aliens),
and Title 18, United States Code, § 371 (Conspiracy),namely:

i.  Information relating to who created,
accessed, or used the SUBJECT ACCOUNT, including records about
their identities and whereabouts.

ii.  E-mail messages and content between SUBJECT
ACCOUNT and evaghermes@mac.com, oghermes@mac.com, any and all
communications that discuss working conditions, salary,
benefits, work schedules and visa application process.

b.   All records and information described above in Section II.10.b.

## IV.   **PROVIDER PROCEDURES**

12.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.   The PROVIDER shall send such information to:

> Special Agent Marcus Valle
> 100 N. Barranca Street
> Suite 520
> West Covina, CA 91791
> Phone: (626) 858-1722
> Fax: (626) 858-1727
> E-mail: valle.marcus@oig.dol.gov

59.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant. IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the PROVIDER complies with this warrant or such later date as may be set by the Court upon application for an extension by the United States.   Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 12 above of its intent to so notify.

**AFFIDAVIT**

I, Marcus Valle, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.    I am a Special Agent ("SA") with the U.S. Department of Labor ("DOL"), Office of Inspector General ("DOL-OIG"), and have been so employed since October 2012.  I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia. My responsibilities as a SA with DOL-OIG include investigating waste, fraud, and abuse of various DOL programs.  During my tenure as a SA, I have participated in, and conducted investigations of, criminal activity including immigration fraud, embezzlement of union funds, embezzlement of employee benefit plans, unemployment insurance fraud, healthcare fraud, worker exploitation, labor trafficking, and labor racketeering. I have participated in the execution of numerous search and arrest warrants and have seized evidence of violations of federal law.

2.    Through my training and experience, I have become familiar with the methods of operation and techniques used by individuals involved in labor trafficking of foreign nationals, as well as illegally harboring foreign nationals in the United States for the purpose of employing the foreign national. Generally speaking, an individual involved in labor trafficking from abroad recruits, solicits, and/or hires foreign nationals for the purpose of exploiting them for labor or services in the United States ("U.S.") under false or fraudulent pretenses. Many traffickers use genuine visas to enable their victims to

legally enter the U.S., but coach victims to disguise the true purpose of their visit and/or misrepresent the terms of their work arrangement.  Upon arrival in the U.S., it is common for trafficking victims to be required to work longer hours, conduct more duties, live in poor living conditions, pay higher than agreed upon fees for housing and transportation, and be paid below the federal minimum wage.  In efforts to ensure victims comply with the trafficker, labor traffickers at times take possession of all immigrations documents, including passports. To further aid in the labor exploitation, traffickers use coercion, deceit, fraud, force, physical violence, and psychological and economic harm to maintain control over and restrict the liberty of the labor trafficking victim.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from law enforcement and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## PURPOSE OF THE AFFIDAVIT

4.    I make this affidavit in support of an application for a warrant for information associated with the accounts identified as "evaghermes@mac.Com" ("SUBJECT ACCOUNT 1"), "evaghermes@me.com" ("SUBJECT ACCOUNT 2") "Oghermes@mac.com"

("SUBJECT ACCOUNT 3"), and "oghermes@me.com" ("SUBJECT ACCOUNT 4") collectively referred herein as the "SUBJECT ACCOUNTS" that are stored at a premises controlled by Apple Inc. (the "PROVIDER") a provider of electronic communication headquartered at 1 Infinite Loop M/S 169-5CLP Cupertino, CA 95014.[1]  The information to be searched is described in Attachment A.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER to disclose to the government

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

5.    As described more fully below, I respectfully submit there is probable cause to believe that the information associated with SUBJECT ACCOUNTS constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of Title 18, United States Code, § 1590 (Labor Trafficking); Title 18, United Stated Code, § 1351 (Fraud in Foreign Labor Contracting); Title 18,  United States Code, § 1546 (Fraud and Misuse of Visas, Permits, and Other Documents); Title 8, United States Code, § 1324(a) (Unlawful Employment of Aliens); Title 8, United States Code, § 1324(a)(1)(a)(iv) (Bringing in and Harboring Certain Aliens), and Title 18, United States Code, § 371 (Conspiracy).

## SUMMARY OF INVESTIGATION

8.    On or about December 15, 2017, I received a case referral from the U.S. Department of Homeland Security, Homeland Security Investigations ("DHS-HSI") and the Santa Barbara County Sheriff's Department ("SBCSD") relating to labor trafficking allegations of two victims.

9.    The two victims, herein after referred to as ("Victim 1") and ("Victim 2") alleged they were brought to the U.S. by Eva Guerrand-Hermès ("EVA") and Olaf Guerrand-Hermès ("OLAF"), collectively referred herein as ("GUERRAND-HERMÈS"), to work as child caretakers at their home in Montecito, California, within the Central District of California.

10.   According to the victims and records I have personally reviewed, between at least January 2009 and September 2017, Victim 1 and Victim 2, corresponded with GUERRAND-HERMÈS at the SUBJECT ACCOUNTS for the purpose of facilitating their visa process; discussing travel arrangements; work schedules, and wages and salaries among other things.

## VICTIM 1

11.   Between November 9, 2017, and January 5, 2018, Victim 1 was interviewed twice by law enforcement during which I was either present and/or reviewed a report documenting what was said to other law enforcement officers.  During those two interviews, Victim 1 conveyed, in part, the following to law enforcement:

a. Victim 1 was born in Morocco and was the eldest of seven siblings.  Sometime during the year 2005, Victim 1 was attending a university and working at night in Morocco.  On or about the same time, Victim 1 met and began providing part-time childcare services for GUERRAND-HERMÈS' two minor children at

the GUERRAND-HERMÈS' vacation home in Northern Morocco for a salary that was equivalent to approximately $500.00 U.S. dollars per month.

b. A relative of Victim 1 worked for GUERRAND-HERMÈS at their home in Paris, France.

c. Victim 1 described her family as poor and in need of money.

d. Sometime around May 2007, GUERRAND-HERMÈS sought a nanny for their newborn daughter.  Through Victim 1's relative, GUERRAND-HERMÈS expressed interest in hiring Victim 1 to work for them in the United States.  Victim 1's parents strongly encouraged Victim 1 to accept the position.

e. Victim 1 was told by individuals working for GUERRAND-HERMÈS that the position in the U.S. only entailed childcare and included a salary of $9,000 dirhams[3] per month.  The monthly salary was to be deposited into a Moroccan bank account to which Victim 1's father had access.

**VICTIM 1 VISA PROCESS**

f. After accepting the position, GUERRAND-HERMÈS helped Victim 1 obtain one European visa and one U.S. visa on or about

---

[3] Dirhams is the basic monetary unit of Morocco and the United Arab Emirates.  Based upon my review of publically available information online, I believe 9,000 dirhams in 2017 was equivalent to approximately $1,000 U.S. dollars.

October 2007 so Victim 1 could travel with GUERRAND-HERMÈS and work for them as a nanny.

g. Beginning sometime in 2009, GUERRAND-HERMÈS assisted Victim 1 with obtaining another U.S. visa.  At or about this time, Victim 1 communicated with EVA via SUBJECT ACCOUNT 1 to discuss the visa process and receive any necessary instructions relating to her visa and consulate appointments.

h. EVA supplied Victim 1 with documents needed by the U.S. Consulate via SUBJECT ACCOUNT 1.  Such documents included a letter and a purported employment contract[4] that purported to represent the wages, hours, and benefits VICTIM 1 was to receive while working for GUERRAND-HERMÈS in the U.S.

i. Additionally, GUERRAND-HERMÈS facilitated the visa process for Victim 1 by paying for all necessary fees, completing any necessary paperwork, and coaching Victim 1 on

---

[4] Based upon records I have reviewed, it appears that EVA sent the "Nanny Employment Contract" to Victim 1 in 2009 and understood the Nanny Employment Contract would also be submitted to U.S. Consulate officials in connection with Victim 1's visa application.  The contract provided, in pertinent part, that Victim 1 would be expected to work six hours per day, and be paid US$ 650 per week and US$22 per hour in overtime.  The employment contract was signed by EVA and Victim 1.  Based upon my review of evidence related to the investigation to date and my experience in labor-related investigation, it appears to me that the purpose of submitting the Nanny Employment Contract to U.S. Consulate officials was to mislead the U.S. Consulate Officials by making it appear GUERRAND-HERMÈS intended to follow appropriate labor laws while employing Victim 1 in the U.S.

what to say to consulate officials in hopes of ensuring issuance of the visa.

     j. During the Consulate interviews, Victim 1 recalled EVA suggesting Victim 1 tell Consulate officials that she had a fiancé in Morocco who was enlisted in the military in order to make it appear Victim 1 had strong ties to Morocco and therefore was not intending to immigrate to the U.S.

## WORKING IN MONECITO

     k. Upon receipt of Victim 1's first U.S. visa, Victim 1 traveled to the U.S. in October 2007.  Soon after arriving at the Montecito[5] home, Victim 1 was told she was expected to clean, cook, iron, laundry, conduct meal preparation, and serve others in addition to caring for GUERRAND-HERMÈS' minor children.

     l. Victim 1's passport was withheld by GUERRAND-HERMÈS and Victim 1's movement was generally restricted to the grounds of the Montecito home.

     m. Shortly after arriving in the U.S., Victim 1 was unhappy with the working conditions and requested to terminate the employment relationship and return to Morocco.  EVA and OLAF denied Victim 1's request.  According to Victim 1, EVA and OLAF told her that they had paid a lot of money to obtain Victim 1's

---

[5] Montecito is an unincorporated community in Santa Barbara County, California, located east of the City of Santa Barbara.

visa and therefore Victim 1 was obligated to work for them for a minimum of five years.

n. After a few months of working in the U.S., Victim 1 became aware that EVA intended to pay Victim 1 less than originally agreed upon.  Instead of a monthly salary of 9,000 dirhams, EVA only paid Victim 1 6,000 dirhams per month and the remaining 3,000 dirhams needed to be earned in gratuities by working at social events hosted by GUERRAND-HERMÈS.

o. For the first two or three years of employment, Victim 1 described working seven days a week, almost around the clock with no days off.  Victim 1's work included, in addition to childcare, the majority of all household chores.

p. Sometime in or about 2009 or 2010, Victim 1 complained to EVA again about the working conditions in Montecito and requested breaks free and clear of conducting any household duties.  EVA agreed and began giving Victim 1 two hour breaks that resulted in Victim 1's daily work hours being reduced to between 11.5 and 13.5 hours a day six days a week.  This schedule continued for Victim 1 for the next 3-4 years.

q. In 2010, Victim 1 began a romantic relationship with someone she met online.  Based upon this relationship, Victim 1 requested, and was granted permission by GUERRAND-HERMÈS, to live outside of the GUERRAND-HERMÈS home beginning sometime in 2010.

r. In or around March 2013, Victim 1 requested EVA provide Victim 1 with her passport so Victim 1 could attend to a medical need.  EVA provided Victim 1 with the passport.  EVA informed Victim 1 that EVA had failed to file the proper immigration extensions that allowed Victim 1 to be lawfully present in the U.S.  According to Victim 1, EVA used Victim 1's presumed illegal presences in the U.S. as a means to coerce her to continue to work long hours and for low wages with no overtime payment.

s. After reviewing border crossings provided by the U.S. Department of Homeland Security, it appears Victim 1 traveled outside the United States at least ten times between approximately October 7, 2007, and January 4, 2012.

t. As part of her employment, Victim 1 was expected to travel with the GUERRAND-HERMÈS family to vacation destinations and other properties owned by GUERRAND-HERMÈS where Victim 1 was expected to work.

u. Included in the ten foreign trips referenced above, GUERRAND-HERMÈS occasionally arranged for Victim 1 to return to Morocco for a few weeks to visit with family.  When Victim 1 was paid in dirhams, Victim 1 sometimes used the visits to Morocco to accept payment from GUERRAND-HERMÈS for Victim 1's work in the U.S.

v. Included in the ten foreign trips referenced above are two occasions on which Victim 1 traveled to Mexico and Morocco, respectively, on trips that were not facilitated by GUERRAND-HERMÈS.  Both of these trips occurred after Victim 1 was married.

w. At the completion of any foreign travel, Victim 1 returned to the GUERRAND-HERMÈS Montecito home to continue working because she was under the assumption she needed to provide five years of service.

x. Victim 1 successfully left the working conditions imposed by GUERRAND-HERMÈS on two occasions but felt obligated to return and seek work with GUERRAND-HERMÈS because, as explained further below, Victim 1's sibling (Victim 2) was still employed by GUERRAND-HERMÈS and Victim 1 believed she was unable to seek employment anywhere else in the U.S. other than with the GUERRAND-HERMÈS family.

y. After Victim 1 began living outside the GUERRAND-HERMÈS' home, Victim 1 requested she be paid higher wages. Between approximately March 2010 and October 2014, GUERRAND-HERMÈS increased Victim 1's monthly salary on two occasions. Prior to Victim 1 accepting a part-time schedule with GUERRAND-HERMÈS in 2014, Victim 1 was earning approximately $1,800 per month for working approximately 11.5 hours per day, six days per week.

z. On several other occasions, Victim 1 sought to renegotiate the terms of her employment, including requesting to work part-time.  According to Victim 1, Victim 1 communicated with EVA and OLAF over SUBJECT ACCOUNT 1 regarding these requests.

aa.    Victim 1 took a few months of leave in 2017 to attend to a medical/family need.  In August of 2017, Victim 1 again began communicating with EVA and OLAF via e-mail to coordinate a return to work.  Victim 1 was ultimately told by GUERRAND-HERMÈS that Victim 1's services were no longer needed due to the minor children being older and, as a result, HUERRAND-HERMÈS ended the employment relationship.

bb.    In September 2017, Olaf sent Victim 1 an email from SUBJECT ACCOUNT 2 offering to pay Victim 1 severance pay.

### **VICTIM 2**

12.  On or about January 24, 2018, SBCSD Detective Matthew Fenske and I interviewed Victim 2, during which Victim 2 provided, in part, the following information:

a. Victim 2 is a sibling of Victim 1.  Victim 2 met GUERRAND-HERMÈS in Morocco where Victim 2 provided childcare services for GUERRAND-HERMÈS at their vacation home in Northern Morocco.

b. Victim 2 was informed by GUERRAND-HERMÈS that Victim 2 was recruited to work for GUERRAND-HERMÈS as a nanny in the U.S.

after another domestic helper from Morocco failed to return to
the U.S. after visiting Morocco on vacation.

c. Victim 2 worked one summer in Morocco for GUERRAND-
HERMÈS before Victim 2 agreed to accept a nanny position in the
U.S. in 2008 in exchange for a salary of 9,000 dirhams per month
(approximately $1,000 U.S. dollars).

**VICTIM 2 VISA PROCESS**

d. GUERRAND-HERMÈS facilitated the visa process for
Victim 2 in order for Victim 2 to travel to the U.S. and begin
working.

e. EVA was responsible for preparing all necessary
paperwork for Victim 2's tourist visa.  EVA met with Victim 2
and discussed how to properly answer questions by consulate
officials.  Victim 2 specifically recalled EVA encouraging
Victim 2 to falsely claim Victim 2 had been working as a nanny
for EVA and OLAF for eight years.  EVA purportedly instructed
Victim 2 to inform consulate officials that Victim 2 was
accompanying EVA and OLAF to the U.S. for medical treatment.

f. In or around September 2008, Victim 2 was issued a
tourist visa, entered the U.S., and began what Victim 2 thought
was a child caretaking position for GUERRAND-HERMÈS, but in
reality included other household tasks to include cleaning,
laundry, ironing, and meal service.

13

g. Prior to agreeing to move to the United States, Victim 2 was told by Victim 1 that her (Victim 1's) duties in the United States were different than her duties in Morocco and that Victim 2 would be required complete tasks unrelated to childcare.  At the time, Victim 2 believed Victim 1 was being lazy and overreacting to her GUERRAND-HERMÈS requests. also included extensive housekeeping work.

**WORKING IN MONTECITO**

h. Upon arriving in Montecito, Victim 2's passport was taken by GUERRAND-HERMÈS and Victim 2 was instructed to begin conducting other household chores outside the scope of child care, including ironing, cleaning, laundry, meal prep, and serving.

i. After working for GUERRAND-HERMÈS for approximately three to four months, Victim 2 returned to Morocco at the direction of GUERRAND-HERMÈS.  While in Morocco, GUERRAND-HERMÈS declined to pay Victim 2 3,000 dirhams of the 9,000 dirhams owed for Victim 2's service in the U.S.  Victim 2 was told by Victim 1 that despite what GUERRAND-HERMÈS had told Victim 2, that GUERRAND-HERMÈS only paid 6,000 dirhams per month.  The additional 3,000 dirhams were expected to be earned by Victim 2 in gratuities earned during social events hosted by GUERRAND-HERMÈS.

14

j. Between approximately 2008 and 2010, Victim 1 and Victim 2 shared all household chores and worked seven days a week with no days off.  Victim 2's work-day began around 7 a.m. and ended around 9 p.m.  The duties included childcare, cleaning, food preparation, serving food and drinks, laundry, and ironing.

k. In response to complaints by Victim 2 about the long hours and additional duties, beginning sometime in 2010, Victim 2 began to receive approximate 2 hour breaks each day between the hours of 3 p.m. and 5 p.m.  Later in 2010, Victim 2 was allowed to attend ESL classes[6] twice a week at night from the hours of 7:00 p.m. to 9:30 p.m.  On days that Victim 2 attended the ESL class, Victim 2 was not allowed to take her two-hour break from 3 p.m. to 5 p.m. because Victim 2 needed to complete the chores Victim 2 normally completed at night.

l. In or around 2011, Victim 2 requested and received a pay advance of $1,500 from GUERRAND-HERMÈS in order to purchase a car.  Around the same time period, GUERRAND-HERMÈS began giving Victim 2 half days off on Sunday during which Victim 2 was allowed to leave the property and visit Victim 1.

m. After reviewing border crossings provided by the U.S. Department of Homeland Security, it appears Victim 2 traveled

---

[6] ESL is a commonly used abbreviation for "English as a second language" classes.

with GUERRAND-HERMÈS outside the United States on at least nine occasions between September 6, 2008, and January 21, 2014.

n. While employed by GUERRAND-HERMÈS, Victim 2's travel was arranged and paid for by GUERRAND-HERMÈS.  As part of her employment, Victim 2 was typically expected to travel with the GUERRAND-HERMÈS family to vacation destinations and other properties owned by GUERRAND-HERMÈS where Victim 2 was expected to work.

o. Included in the nine trips referenced above, GUERRAND-HERMÈS occasionally arranged for Victim 2 to return to Morocco for a few weeks to visit with family.  When Victim 2 was paid in dirhams, Victim 2 sometimes used the visits to Morocco to accept payment from GUERRAND-HERMÈS for her work in the U.S.

p. At the completion of any foreign travel, Victim 2 returned to GUERRAND-HERMÈS Montecito home to continue working primarily because of her family's financial dependence on her earnings as well as an obligation to help her sister (Victim 1) who was with GUERRAND-HERMÈS during all visits Victim 2 made to visit her family in Morocco.

q.  Victim 2 corresponded by email with EVA and OLAF through SUBJECT ACCOUNTS 1 and 2 to discuss salary deposits in Victim 2's Moroccan bank account and to coordinate work schedules.

r. Sometime in 2014, Victim 2 found her passport in the office of GUERRAND-HERMÈS while cleaning.  One night after getting in an argument with EVA over the working conditions, Victim 2 retrieved her passport and clothes in the middle of the night and fled GUERRAND-HERMÈS' home.  Victim 2 went to Victim 1's residence nearby.

s. In the absence of Victim 1, Victim 2's household responsibilities significantly increase.  Victim 2 made the decision to flee the home in 2014 after becoming overwhelmed with the workload that resulted from Victim 1 being pregnant on unable to assist Victim 2 with the household duties.

t. Following the departure of Victim 2 from the home, EVA contacted Victim 1 and encouraged Victim 1 tell Victim 2 to think about Victim 1's family and to convince Victim 2 to return to work.  Victim 1 reported that she felt EVA was attempting to coerce Victim 1 to convince Victim 2 to return to work.

u. EVA purportedly threatened to call immigration on Victim 2 if Victim 2 did anything "wrong."  Victim 1 and Victim 2 perceived EVA's threats of calling immigration as a means of controlling their actions and getting Victim 1 and Victim 2 to do what she wanted them to do, which was to return to work.  Being that Victim 1 had just given birth, the threat of calling to immigration installed fear in Victim 1, because

EVA's threat alluded to possibly be deported and separated from her newborn children.

 v. After leaving the GUERRAND-HERMÈS' home, Victim 2 did not have any money and began searching for a job.  Victim 2 applied to work at a Kentucky Fried Chicken Restaurant ("KFC") in Santa Barbara using a fake social security number.

 w. Shortly after Victim 2 accepted a job at KFC, Victim 1 was also in search of employment.  Victim 1 felt she had no choice but to seek work with GUERRAND-HERMÈS.  As a result, Victim 2 felt obligated to assist Victim 1 with securing employment with GUERRAND-HERMÈS.

 x. Starting in 2014, Victim 1 and 2 agreed to split their hours working for GUERRAND-HERMÈS into two shifts in an labors to ensure Victim 1 was able to secure employment with GUERRAND-HERMÈS.  As part of this arrangement, Victim 1 and 2 negotiated an hourly salary ranging between $20 and $25 an hour.  The working arrangements continued until September 2017.

### SUMMARY OF VICTIM 1's EMAIL CORRESPONDENCE

 13.  On or about January 26, 2018, I reviewed approximately ten emails between Victim 1, EVA, and OLAF, which Victim 1 provided to me.  The email correspondence covered a period between approximately January 15, 2009, and September 9, 2017. In the emails I reviewed, Victim 1 corresponded with GUERRAND-HERMÈS through SUBJECT ACCOUNTS 1-3.

14.   Of the ten emails I reviewed[7], five were between Victim 1 and EVA and five were between Victim 1 and OLAF.  One email between Victim 1 an EVA appeared to concern Victim 1's U.S. visa application process.  Seven emails between Victim 1 and either EVA or OLAF appeared to concern Victim 1's working conditions, including discussions about wages/salary, benefits, and schedules.

### SUMMARY OF VICTIM 2's EMAIL CORRESPONDENCE

15.   On or around February 14, 2018, I reviewed seven emails between EVA, OLAF and Victim 2, which Victim 2 provided to me.  The emails covered the time period between August 27, 2013 and January 9, 2014.  Victim 2 corresponded with GUERRAND-HERMÈS via SUBJECT ACCOUNTS 1-3.  Of the seven emails[8], six appeared to concern coordinating the deposit of Victim 2's salary in Morocco.  In addition, one email discussed travel logistics for Victim 2 with a third party.

### MICROSOFT SEARCH WARRANT

16.   On or about April 6, 2018, the Honorable Alka Sagar, United States Magistrate Judge, issued a search warrant for Microsoft Corporation to obtain the content of the Hotmail email

---

[7] Eight of the ten emails were written in French, and Google Translate was used for an unofficial translation, which is what I reviewed.

[8] Six of the seven emails were written in French, and Google Translate was used for an unofficial translation, which is what I reviewed.

accounts for used by Victim 1 and Victim 2, respectively (the "Hotmail Warrant").

17.  In or about June 2018, I reviewed email correspondence produced in response to the Hotmail Warrant.  The review revealed multiple sent and received e-mail communications between Victim 1 and Victim 2 and GUERRAND-HERMÈS using SUBJECT ACCOUNTS 1, 2, and 3.

## MEETING WITH COUNSEL FOR GUERRAND-HERMÈS

18.  On March 26, 2019, I, along with government counsel, and other law enforcement agents investigating this matter, met with counsel for GUERRAND-HERMÈS.  During that meeting, counsel for GUERRAND-HERMÈS presented evidence they asserted rebutted the assertions made by Victim 1 and Victim 2.  Specifically, counsel for GUERRAND-HERMÈS presented summaries of interviews with other current and former domestic employees of GUERRAND-HERMÈS who, according to counsel for GUERRAND-HERMÈS, reported that they were treated well by GUERRAND-HERMÈS and paid an appropriate wage.  Counsel for GUERRAND-HERMÈS also presented evidence, including photographs of Victim 1 and Victim 2 interacting with the GUERRAND-HERMÈS family, that purportedly contradicted specific accounts provided by Victim 1 and Victim 2.  Pertinent to this warrant application, counsel for GUERRAND-HERMÈS showed the government certain email correspondence sent by EVA and OLAF regarding the work schedules of Victims 1 and 2.

20

19.  Following the meeting with counsel for GUERRAND-HERMÈS, the government requested that GUERRAND-HERMÈS produce the emails that were shown to the government during the presentation by GUERRAND-HERMÈS' counsel.

20.  On or about April 26, 2019, I reviewed emails produced to the government by counsel for GUERRAND-HERMÈS.  The emails I reviewed included emails sent and/or received by EVA and/or OLAF from SUBJECT ACCOUNTS 1, 2, 3, and 4 for the period of time between approximately May 5, 2009, and February 11, 2019.  The majority of the emails concerned communications between GUERRAND-HERMÈS and their household employees, including personal assistants, drivers, and Victim 1 and Victim 2.  Some of the content discussed in the emails included travel, salaries, schedules, and employment related instructions/directives.  Many of the emails produced by counsel for GUERRAND-HERMÈS were sent by EVA and/or OLAF to individuals other than Victim 1 or Victim 2 and thus were not captured in the emails seized pursuant to the Hotmail Warrant.

21.  Following the meeting with counsel for GUERRAND-HERMÈS, the government informed counsel for GUERRAND-HERMÈS that the government sought to obtain all email correspondence possessed by GUERRAND-HERMÈS related to Victim 1 and/or Victim 2.

22.   I reviewed an email from the government to counsel for GUERRAND-HERMÈS dated April 1, 2019, in which the government invited GUERRAND-HERMÈS to voluntarily produce the emails the government sought concerning Victim 1 and Victim 2.   Government counsel informed me that the counsel for GUERRAND-HERMÈS declined to produce the emails voluntarily.

23.   On or about April 5, 2019, I sent a preservation letter to the Provider requesting that the Provider preserve content from the SUBJECT ACCOUNTS 1 and 3.

24.   Other than what has been described herein, to my knowledge the United States has not attempted to obtain the contents of the SUBJECT ACCOUNTS 1-4 by other means.

## BACKGROUND ON EMAIL AND PROVIDERS

25.   In my training and experience, I have learned that providers of e-mail offer a variety of online services to the public.   Providers, like the PROVIDER, allow subscribers to obtain accounts like the SUBJECT ACCOUNT.   Subscribers obtain an account by registering with the provider.   During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account.   Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).   Some

22

providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

26.  Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail or message transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

27.  A subscriber of the PROVIDER can also store with the PROVIDER files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by the PROVIDER. In my training and experience, evidence of who was using an account may be found in such information.

28.  In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was

created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e mail and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

29.  I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was.  Often those pieces will come

from a time period before the account was used in the criminal activity. Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account. Therefore, the contents of a given account, including the e-mail addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account. For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all information associated with a SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

30. Relatedly, the government must be allowed to determine whether other individuals had access to a SUBJECT ACCOUNT. If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

31. I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or code-words (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime

involved.   In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.   "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

32.   This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

33.   As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

34.   I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.   Even if the provider kept an original

copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

**35.**  I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it and its contents may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

<u>**SERVICES PROVIDED BY APPLE, INC.**</u>

36.  Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

37.  Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via

web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

38.  Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

39.  iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

40.  iCloud is a file hosting, storage, and sharing service provided by Apple.  iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

41.  iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs enables iCloud to be used to synchronize webpages opened in the Safari web browsers on all of the user's Apple devices.  iWorks

28

Apps, a suite of productivity apps (Pages, Numbers, and Keynote), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.  iCloud can also be used to back up various settings and history of a user's activity, such as searches and web history.

42.  Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

43.  Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.

44.  Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

45.  App Store and iTunes Store are used to purchase and download digital content.  iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.  Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

46.  Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple

device or through the iTunes or iCloud services.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

47.  An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

48.  Apple captures information associated with the creation and use of an Apple ID.  During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or

closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

49.   Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.   For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.   Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, and "mail logs" for activity over an Apple-provided email account.   Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

50.   Apple also maintains information about the devices associated with an Apple ID.   When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.   In

addition, information about a user's computer is captured when
iTunes is used on that computer to play content associated with
an Apple ID, and information about a user's web browser may be
captured when used to access services through icloud.com and
apple.com.  Apple also retains records related to communications
between users and Apple customer service, including
communications regarding a particular Apple device or service,
and the repair history for a device.

    51.  Apple provides users with five gigabytes of free
electronic space on iCloud, and users can purchase additional
storage space.  That storage space, located on servers
controlled by Apple, may contain data associated with the use of
iCloud-connected services, including: email (iCloud Mail);
images and videos (iCloud Photo Library, My Photo Stream, and
iCloud Photo Sharing); documents, spreadsheets, presentations,
and other files (iWorks and iCloud Drive); and web browser
settings and Wi-Fi network information (iCloud Tabs and iCloud
Keychain).  iCloud can also be used to store iOS device backups,
which can contain a user's photos and videos, iMessages, Short
Message Service ("SMS") and Multimedia Messaging Service ("MMS")
messages, voicemail messages, call history, contacts, calendar
events, reminders, notes, app data and settings, and other data.
Records and data associated with third-party apps may also be
stored on iCloud; for example, the iOS app for WhatsApp, an
instant messaging service, can be configured to regularly back
up a user's instant messages on iCloud.  Some of this data is

stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

52. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

53. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

54. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware

and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

55.  Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

56.  Other information connected to an Apple ID may lead to the discovery of additional evidence.  For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

57.  Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the

crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

58.   Based on the foregoing, I request that the Court issue the requested warrant.

_____
Marcus Valle, Special Agent
U.S. Department of Labor,
Office of Inspector General

Subscribed to and sworn before me
on May     , 2019.


_____
HONORABLE
UNITED STATES MAGISTRATE JUDGE